## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

THE TOWNHOMES AT FISHERS POINTE )
HOMEOWNERS ASSOCIATION, INC., )
                                     )
                  Plaintiff, )
                                      )
                    v. )     Case No. 1:23-cv-00475-TWP-MG
                                      )
DEPOSITORS INSURANCE COMPANY, )
                                      )
               Defendant. )

### ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on cross-motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56. Following a 2020 hailstorm, Plaintiff, The Townhomes at Fishers Pointe Homeowners Association, Inc. ("the HOA") initiated this action seeking to supplement or set aside an appraisal award, and alleging that the Defendant, Depositors Insurance Company ("Depositors") breached the insurance policy and acted in bad faith. The HOA filed a Motion for Partial Summary Judgment against Depositors on Count II of its Complaint, Breach of Insurance Policy Contract ([Filing No. 53](#)). Depositors then filed a Cross Motion for Summary Judgment seeking judgment as a matter of law on all three counts of the HOA's Complaint ([Filing No. 57](#)). For the following reasons, the Court **denies** the HOA's motion for partial summary judgment, and **grants in part** and **denies in part** Depositors' cross-motion.

## I.      LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation, but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs*,

335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arb. Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

## II.    **BACKGROUND**

### A. **The Parties and the Policy**

Plaintiff HOA is a homeowners' association for fifteen condominium buildings known as The Townhomes at Fishers Pointe (the "Townhomes") (Filing No. 52-1 at 17–18). The HOA is a named insured, and the Townhomes are an insured property, under a Depositors insurance policy (the "Policy") (Filing No. 58-1). The Policy provides that Depositors "will pay for direct physical loss of or damage to Covered Property . . . resulting from any Covered Cause of Loss." *Id.* at 45. The Policy also contains the following loss payment provision:

    a.   At our option, we will either:

        (1) Pay the value of lost or damaged property as described in e. below;

        (2) Pay the cost of repairing or replacing the lost or damaged property; . . . [or]

        (4) Repair, rebuild or replace the property with other property of like kind and quality . . . .

    e.   . . . [W]e will determine the value of Covered Property as follows:

        (1) At replacement cost without deduction for depreciation, subject to the following:

            (a) We will pay the cost to repair or replace, . . . but not more than the least of the following amounts . . . : . . . .

                (ii) The cost to replace, on the same premises, the lost or damaged property with other property:

    i.   Of comparable material and quality; and

    ii.  Used for the same purpose . . . .

*Id.* at 72 (emphasis in original).

The Policy's appraisal provision (the "Appraisal Provision") provides that if Depositors and the HOA "disagree on the amount of loss," then either may make a written demand "for an appraisal of the loss." *Id.* at 71. Each party may select an appraiser to "state separately the value of the property and the amount of loss." *Id.* If the two appraisers cannot agree, then they must submit the dispute to an umpire who is selected by the appraisers, or, if the appraisers cannot agree, a judge. "A decision agreed to by any two [of the umpire and appraisers] will be binding." *Id.*

### B. <u>The Claim Dispute</u>

In April 2020, the Townhomes sustained damage from a hailstorm. The HOA submitted a claim to Depositors, and Depositors inspected the Townhomes to evaluate the cause and scope of the damage ([Filing No. 58-4 at 36](#)–38). In June 2020, Depositors issued an estimate of $101,626.67 for the replacement cost value of loss to the Townhomes and paid the HOA pursuant to that estimate ([Filing No. 52-5 at 37](#)–67; [Filing No. 58-3](#)). Depositors' initial estimate did not note hail damage to the Townhomes' roof shingles. *Id.* at 70.

Meanwhile, the HOA retained a roof consultant, Alliance Consulting & Testing Inc. ("Alliance"), and a roofing contractor, Rocklane Company, LLC ("Rocklane"), to prepare their own reports and an estimate. Rocklane prepared a replacement cost value estimate totaling $964,904.76, which found hail damage to shingles and provided for complete roof replacements on all fifteen Townhomes buildings ([Filing No. 58-8](#)). Alliance's report was consistent with Rocklane's ([Filing No. 52-4 at 126](#)–40). Rocklane also took a sample shingle from one of the damaged Townhomes buildings and submitted it to an independent lab, ITEL Laboratories, Inc. ("ITEL"), to determine if a matching shingle was available to use for repairs. ITEL prepared a

report (the "ITEL Report") finding that no shingle on the market is "similar" in color to the sample ([Filing No. 52-10](#)).

In June 2020, the HOA emailed Depositors disagreeing with its estimate of $101,626.67, demanding appraisal, and selecting an appraiser ([Filing No. 52-7 at 17](#):20–18:7). In response, Depositors asked the HOA to provide its own estimate for comparison ([Filing No. 58-2 at 17](#):18– 18:11). On July 13, 2020, the HOA emailed Depositors the Rocklane estimate of $964,904.76 but did not send the ITEL Report ([Filing No. 58-8](#)). Depositors responded later that day, stating that the claim was not yet appropriate for appraisal, "as there appears to be a dispute in the damage and not the amount of the claim." ([Filing No. 58-5 at 2](#)). Depositors also stated it had contacted EES Group, Inc. ("EES"), to perform an additional inspection of the Townhomes. *Id.*

In August 2020, EES, accompanied by Alliance, inspected the Townhomes and prepared a report (the "EES Report") ([Filing No. 58-6](#)). The EES Report noted hail damage to ten Townhomes buildings. *Id.* at 7–10. On October 2020, Depositors issued an updated replacement cost value estimate of $130,470.22 based on the EES Report (the "October 2020 Estimate") ([Filing No. 58-7](#)), which accounted for partial roof replacements for nine buildings and a full roof replacement for one. Depositors then made a supplemental payment to the HOA ([Filing No. 58-2 at 42](#):1–14).

## C. **The Appraisal**

A few days before Depositors issued the October 2020 Estimate, the HOA sued Depositors to compel appraisal. *Townhomes at Fishers Pointe Homeowners Ass'n, Inc. v. Depositors Ins. Co.*, No. 20-cv-02788 (S.D. Ind. Oct. 28, 2020) ("*Townhomes I*"). Depositors initially opposed the request for appraisal by arguing, as it did in its July 13, 2020 letter, that the parties "dispute whether the additional damage claimed by [the HOA] is covered under the terms and conditions of the Depositors Policy," which "does not fall within the scope of the appraisal provision." Answer and Affirmative Defenses at 7, *Townhomes I*, No. 1:20-cv-02788 (S.D. Ind. Nov. 4, 2020). However,

Depositors later agreed to appraisal, "[d]espite the existence of substantial outstanding liability and coverage issues which need to be addressed." Brief in Support of Motion to Dismiss at 1, 9, *Townhomes I*, No. 1:20-cv-02788 (S.D. Ind. Dec. 29, 2020).

The HOA selected Matthew Latham ("Mr. Latham") as its appraiser, and Depositors selected William Norman ("Mr. Norman."). The appraisers could not agree on an umpire, so the Court appointed Jeffrey Button ("Umpire Button"). Order Adopting Reports and Recommendations, *Townhomes I*, No. 1:20-cv-0788 (S.D. Ind. July 15, 2021). The parties then stipulated to dismissal of the lawsuit without raising or resolving any outstanding coverage disputes. Joint Stipulation of Dismissal, *Townhomes I*, No. 1:20-cv-0788 (S.D. Ind. Aug. 10, 2021).

Mr. Latham and Mr. Norman each submitted an appraisal package to Umpire Button. Mr. Latham submitted the ITEL Report with his package (Filing No. 52-4 at 214–19), along with a copy of Indiana caselaw and letters from attorneys regarding the shingle matching dispute. *Id.* at 218–19, 319–54. Whether Umpire Button considered the ITEL Report during his appraisal is in dispute. In August 2022, Umpire Button inspected the Townhomes and prepared a repair estimate "to return the property to its pre-loss condition using like kind and quality materials" (the "Award Estimate") (Filing No. 52-4 at 3). The Award Estimate totaled $477,133.88 in replacement cost value and $160,028.97 in depreciation. *Id* at 26. It found that eleven Townhomes buildings had sufficient hail damage to allow for shingle replacement on the north and west slopes, but it did not provide for any full roof replacements. *Id.* at 3–26.

In November 2022, Umpire Button issued an appraisal award (the "Appraisal Award") consistent with the Award Estimate (Filing No. 58-11 at 2). The Appraisal Award was signed by Umpire Button and Mr. Norman. *Id.* at 3. Depositors then made a supplemental payment to the HOA based on the Appraisal Award (Filing No. 58-12).

### D.  **Subsequent Estimates, Repairs, and Litigation**

In late December 2022, Kevin Kortzendorf ("Mr. Kortzendorf") from Rocklane prepared an estimate of $307,676.39 to replace the undamaged roof slopes of the eleven damaged buildings (Filing No. 52-2 at 31). In February 2023, the HOA initiated this lawsuit in state court, seeking to supplement or set aside the Appraisal Award and recover the outstanding amounts needed to complete full roof replacements (Filing No. 6-1 at 8–14). Depositors removed the action to federal court and filed a Motion to Dismiss, which the Court later denied (Filing No. 23).

In July 2023, Gregory Burkert ("Mr. Burkert") from Rocklane prepared an estimate of $306,239.94 to replace the undamaged roof slopes, and Rocklane replaced the roofs of the eleven damaged buildings (Filing No. 52-9 at 19). Once Depositors received notice that the HOA had completed repairs, Depositors issued a check for depreciation in the amount of $160,028.97 pursuant to the Appraisal Award (Filing No. 58-11 at 2; Filing No. 58-13). In spring of 2024, the parties filed their cross-motions for summary judgment, which are now ripe for the Court's review.

### III.     **DISCUSSION**

HOA initiated this action by filing a Complaint alleging three claims: Count I, Claim to Supplement or Set Aside the Appraisal Award; Count II, Breach of Insurance Policy Contract; and Count III, Bad Faith Insurance Claim Handling. (Filing No. 6-1 at 10- 14). The HOA moves for summary judgment on only Count II; asserting that its Policy coverage is broader than the Appraisal Award ("Award") cost of repair, therefore, its Motion for Partial Summary Judgment on the issue of breach of Policy contract should be granted. Depositors move for summary judgment on all of the HOA's claims. Depositors argue that it paid the HOA's claim pursuant to an appraisal award that binds both parties, it has not breached the contract, and that at every stage it has acted in good faith to investigate and adjust the HOA's loss. (Filing No. 59 at 5). The Court will discuss each claim in turn.

**A.**    **Count I: Request to Supplement or Set Aside Appraisal**

Depositors argues that Count I should be dismissed because the Appraisal Award is binding, and the HOA fails to cite an adequate reason to set it aside. The HOA contends that the Appraisal Award may be set aside because it is based on a coverage determination—namely, that mismatching is not a type of loss covered under the Policy. To determine whether the Appraisal Award may be supplemented or set aside, the Court will address four issues: (1) whether under Indiana law an appraisal award may be set aside if the appraiser makes a coverage determination; (2) whether the HOA has identified a coverage determination allegedly made by Umpire Button; (3) whether Umpire Button made a coverage determination; and (4) assuming the Appraisal Award is not binding, whether the HOA is entitled to additional compensation under the Policy (*i.e.*, whether Umpire Button's alleged error is harmless). The Court will then turn to Depositors' concerns regarding the broader implications of this decision.

**1.**    **Whether an Appraisal Award Making Coverage Determinations May Be Set Aside**

Under Indiana law, appraisal awards are binding "except in exceptional circumstances." *Atlas Constr. Co., Inc. v. Ind. Ins. Co., Inc.*, 309 N.E.2d 810, 813 (Ind. Ct. App. 1974). It is well established that "an appraisal award will not be disturbed unless manifestly unjust or is infected with fraud, collusion, misfeasance or the like." *Id.* at 814. "A court will not substitute its judgment for that of the appraisers or set aside an award for inadequacy or excessiveness unless it is so palpably wrong as to indicate corruption or bias on the part of the appraisers.'" *Id.* at 813–14 (quoting *Lakewood Mfg. Co. v. Home Ins. Co. of N.Y.*, 422 F.2d 796, 798 (6th Cir. 1970), *cert. denied*, 400 U.S. 827 (1970)).

One question that Indiana courts have not yet squarely addressed is whether an appraisal award may be set aside if the appraiser makes a coverage determination.[1] Although the Seventh Circuit recently decided two "matching" cases—*Windridge of Naperville Condominium Association v. Philadelphia Indemnity Insurance Co.* ("*Windridge*") and *Villas at Winding Ridge v. State Farm Fire & Casualty Company* ("*Villas*")—neither case decided whether an improper coverage determination is adequate cause to set aside an appraisal award under Indiana law.

In *Windridge*, a hailstorm damaged the aluminum siding on condominiums, and the insurer moved to compel appraisal. *Windridge of Naperville Condo. Assoc. v. Phila. Indem. Ins. Co.*, 932 F.3d 1035 (7th Cir. 2019) ("*Windridge II*"); *Windridge of Naperville Condo. Assoc. v. Phila. Indem. Ins. Co.*, No. 16 C 3860, 2018 WL 1784140 (N.D. Ill. Apr. 13, 2018) ("*Windridge I*"). The parties disputed whether the insurer was required to replace all of the siding to ensure matching. The district court ordered the parties to proceed with appraisal "as to the damage indisputably covered by the policy, but not as to the claimed damage over which there was a genuine coverage dispute." *Windridge II*, 932 F.3d at 1037. So the umpire in *Windridge* did not make any coverage determinations, and the *Windridge* court did not decide whether a coverage determination would warrant setting aside an appraisal award.

In *Villas*, a hailstorm damaged the roofs of a condominium complex, and the parties submitted their disputes to appraisal. *Villas at Winding Ridge v. State Farm Fire & Cas. Co.*, 942 F.3d 824, 824 (7th Cir. 2019) ("*Villas II*"); *Villas at Winding Ridge v. State Farm Fire & Cas. Co.*, No. 16-cv-3301, 2019 WL 1434220 (S.D. Ind. Mar. 29, 2019) ("*Villas I*"). The appraisal award allowed partial roof replacements, but the insured wanted full replacements to ensure matching. The insured argued that the umpire "mistakenly determined the scope of loss" by failing to account

---

[1] When referring to "coverage determinations," the Court does not mean causation determinations, which are appropriate for appraisal. *See Phila. Indem. Ins. Co. v. WE Pebble Point*, 44 F. Supp. 3d 813, 817 (S.D. Ind. 2014).

for loss resulting from mismatched slopes, so the award should be set aside. *Villas II*, 942 F.3d at 831. But the *Villas* insured, unlike the HOA, failed to present the matching issue to the umpire during the appraisal. *Id.* The Seventh Circuit explained that because the umpire resolved all disputes "that the parties presented to him," the award was binding as to the entire amount of loss recoverable under the policy. *Id.* at 831–32 ("The parties submitted the disputed loss to the umpire, and that disputed loss did not include the replacement of the shingles on all buildings. The umpire resolved the parties' dispute. . . . Winding Ridge's matching shingles argument was untimely."). *Villas* therefore did not decide whether an award may be set aside if an umpire *does* make a coverage determination, although this Court's dicta in *Villas I* suggests that it may be:

> There are instances when one of the parties contests an umpire's award for proper reasons, such as an allegation that the umpire has improperly considered the scope of coverage. Winding Ridge makes such an argument here, alleging the umpire improperly concluded that cosmetic damage to shingles was not included in Winding Ridge's policy, and thus he did not include it in his "amount of loss" calculation. . . . Those arguments are appropriate—they recognize that appraisers are experts at determining how much damage a property has sustained but insurance adjusters, attorneys, and courts are better-suited to resolve the contractual language, which determines how much of that loss is covered by the policy.

*Villas I*, 2019 WL 1434220, at *8 (ultimately finding appraiser *did* consider cosmetic damage).

Further, although Indiana courts have not defined "mistake or misfeasance" in the context of appraisal awards, their common definitions indicate that an appraiser commits a "mistake or misfeasance" by improperly making a coverage determination. *Mistake*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/mistake (last visited Feb. 27, 2025) (defining mistake as "a wrong action or statement proceeding from faulty judgment, inadequate knowledge, or inattention"); *Mistake*, Black's Law Dictionary (12th ed. 2024) (defining mistake as "[a]n error, misconception, or misunderstanding; an erroneous belief"); *Misfeasance*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/misfeasance (last visited Feb. 27, 2025) (defining misfeasance as "the performance of a lawful action in an . . . improper

manner"); *Misfeasance*, Black's Law Dictionary (12th ed. 2024) (defining misfeasance as "[a] lawful act performed in a wrongful manner").

More fundamentally, it would be unfair to bind parties to legal determinations made by appraisers because neither appraisers nor the appraisal process is well-suited to making those determinations. The Indiana Court of Appeals in *Atlas Construction Co. v. Indiana Insurance Co.* explained the distinction between appraisals and arbitrations and highlighted why legal determinations should be left to the courts:

> In matters of strict appraisal, as here, it is only the amount of the loss which is fixed. Other possible issues such as liability are not determined. . . .
>
> '[A]rbitration presupposes the existence of a dispute or controversy to be tried and determined in a quasi judicial manner, whereas appraisement is an agreed method of ascertaining value or amount of damage, stipulated in advance . . . . Liability is not fixed by means of an appraisal; there is only a finding of value, price, or amount of loss or damage. The investigation of arbitrators is in the nature of a judicial inquiry and involves, ordinarily, a hearing and all that is thereby implied. Appraisers, on the other hand, . . . are generally expected to act upon their own knowledge and investigation, without notice of hearings, are not required to hear evidence or to receive the statements of the parties, and are allowed a wide discretion as to the mode of procedure and sources of information.'

309 N.E.2d at 37 (quoting *Hartford Fire Ins. Co. v. Jones*, 108 So.2d 571, 572 (Miss. 1959)); *see Hahn v. Allstate Ins. Co.*, No. 22-cv-2016, 2024 WL 1012952, at *2 (S.D. Ind. Mar. 7, 2024) ("Determining coverage cannot be resolved by an appraiser and is an issue for the Court."); *Weidman v. Erie Ins. Grp.*, 745 N.E.2d 292, 297–98 (Ind. Ct. App. 2001) (clarifying that an appraisal determines amount of loss, not liability); *accord Hartfold Lloyd's Ins. Co. v. Teachworth*, 898 F.2d 1058, 1061–62 (5th Cir. 1990) (noting "significant differences" between appraisal and arbitration); *In re Delmar Box Co.*, 127 N.E.2d 808, 811 (N.Y. 1955) ("An agreement for arbitration ordinarily encompasses the disposition of the entire controversy between the parties . . . while the agreement for appraisal extends merely to the resolution of the specific issues of actual cash value and the amount of loss, all other issues being reserved for determination in a plenary action.").

It would also be manifestly unfair to bind the parties to legal determinations made by an appraiser where the parties did not agree to delegate those determinations to appraisers. The Appraisal Provision here, like many others, allowed the umpire to determine only the amount of loss. By upholding an award that makes coverage determinations, the Court would be inappropriately altering the terms of the Appraisal Provision. *See, e.g.*, *Gen. Motors Corp. v. Northrop Corp.*, 685 N.E.2d 127, 135 (Ind. Ct. App. 1997) ("Courts do not have the power to create for the parties a contract which they did not make, nor to insert language into a contract which was not inserted by the parties . . . ."); *see also Mesco Mfg., LLC v. Motorists Mut. Ins. Co.*, No. 19-cv-4875, 2020 WL 6400764, at *5 (S.D. Ind. Oct. 30, 2020) ("The award necessarily binds the parties within its scope: deciding the amount of loss."); *Merchant v. Allstate Fire & Cas. Ins. Co.*, No. 21-cv-5099, 2023 WL 6518866, at *13 (N.D. Ga. Sept. 20, 2023) ("Appraisers can only resolve matters of value, so without other evidence or [the insurer's] consent, its appraiser cannot bind it, and the appraisal award specifically indicates that Allstate can reject the award.").

Only a few courts have addressed cases in which appraisers are alleged to have made coverage determinations. The Texas Court of Appeals is one of those courts. In *Tippett v. Safeco Insurance Company of Indiana*, the insured, Tippett, submitted a claim to her insurer, Safeco, after a hailstorm damaged the roof of her home. No. 02-19-00152-CV, 2020 WL 827143, at *1 (Tex. App. Feb. 20, 2020). The parties exchanged estimates, but they disagreed as to whether certain losses were "cosmetic" and thus excluded under the policy. Tippett sued for breach of contract and bad faith, and Safeco invoked the policy's appraisal provision. *Id.* at *2. An umpire later issued an appraisal award stating, in relevant part: "It is my opinion that hail did not damage the . . . roof in a manner that caused or contributed to any interior leaking. . . . My opinion is that this hail denting will not cause a loss of the intended water-shedding functionality of the [roof]." *Id.* (capitalization

omitted). Based on the appraisal award, Safeco prepared a revised estimate, paid Tippett, and moved for summary judgment, "arguing that it had paid the full amount owed under the Appraisal Award and thus conclusively negated" Tippett's claims. *Id.* Tippett argued that the appraisal award was not binding because the umpire made a coverage determination regarding cosmetic damages.

The Texas Court of Appeals described how under Texas law, like Indiana law, appraisal awards are "binding and enforceable in the absence of fraud, accident, or mistake." *Id.* at *5 (citing *State Farm Lloyds v. Johnson*, 290 S.W.3d 886, 888 (Tex. 2009)). Nevertheless, the court held that the appraisal award was not binding because the umpire made a coverage determination. *Id.* at *9–12 ("Appraisal awards may be disregarded when they do not comply with policy terms . . . ."). The parties' dispute "about whether any of the damage, the cause of which is undisputed, are purely cosmetic" was a legal determination, not a causation determination. *Id.* at *12. "The policy [did] not define 'cosmetic' damage or provide any standard for 'functionality' of a metal roof. . . . For the appraiser to make any findings about whether any damage was cosmetic or functional, they necessarily had to construe (or rewrite) the policy," which appraisers cannot do. *Id.* at *13. The Texas Court of Appeals therefore held that Safeco's payment under the appraisal award did not bar Tippett's claims. *Id.* at *17.

The Northern District of Iowa also addressed a similar situation in *Yogeshwar, Inc. v. Society Insurance*. In that case, the insured, Yogeshwar, filed a claim with its insurer, Society, after a storm damaged the roof and interior of its building. 739 F. Supp. 3d 714, 720 (N.D. Iowa 2024). Society denied the claim, and Yogeshwar invoked the policy's appraisal provision. The resulting appraisal award provided for the replacement of only one roof slope, but it did not mention the interior damage or Iowa's "line of sight rule," which requires that repairs result in a reasonably

uniform appearance within the line of sight. *Id.* at 721–22. Both parties' appraisers and the umpire agreed on the award, and Society issued a check to Yogeshwar based on the award. *Id.* at 722.

Yogeshwar later sued Society and argued that the appraisal award should be set aside. The parties disputed whether the appraisal panel made coverage determinations by failing to consider interior damage and the line of sight rule. Society argued that the panel *did* consider those types of losses but valued them at zero dollars. *Id.* at 721. Society cited testimony from its appraiser that the interior damage "'had been there for quite some time,'" and because the interior damage "'was not on the date of loss, the appraisal panel unanimously agreed not to consider it in their award.'" *Id.* As to line of sight, Society's appraiser testified that the building used "'a pretty generic colored shingle, and there's going to be shingles available on the market that are going to represent a reasonable match anyhow. So there is never a line of sight debate at all of really substantial discussion with the appraisal panel.'" *Id.* at 732. Yogeshwar argued that the panel did *not* consider interior damage, relying on its own appraiser's testimony that Society's appraiser stated, "the appraisal panel could not readjust the claim and it would be considered by Society separate and apart from the appraisal." *Id.* at 721. Yogeshwar's appraiser also testified that he was told that Yogeshwar's contractor would need to bring up the line of sight issue with Society for supplementation of the award. *Id.* at 722.

The parties cross-moved for summary judgment. The *Yogeshwar* court applied Iowa law, which, like Indiana and Texas, will not set aside appraisal awards absent "fraud, mistake or misfeasance on the part of an appraiser or umpire." *Id.* at 731 (quoting *Walnut Creek Townhome Assoc. v. Depositors Ins. Co.*, 913 N.W.2d 80, 87 (Iowa 2018)). The district court denied both cross-motions because there were "clearly factual disputes regarding (1) whether the appraisal panel considered interior damage and application of the line of sight rule and decided not to include

either in the appraisal award and (2) whether [Society's appraiser] precluded consideration of these matters by statements he made to [Yogeshwar's appraiser]." *Id.* at 732–33. But the court stated that if the jury sided with Yogeshwar, then the appraisal award could be set aside. *Id.*

The analyses in *Tippett* and *Yogeshwar* are well reasoned and consistent with decades of caselaw reiterating that appraisers may not make coverage determinations. Based on these persuasive decisions[2] and the wealth of Indiana precedent regarding the role of appraisers, the Court finds that under Indiana law, if an appraiser makes a coverage determination in an appraisal award, then the award may be supplemented or set aside. To hold otherwise would erase the crucial distinction between appraisals and arbitrations and improperly alter the parties' contract.

### 2.  <u>Whether the HOA Has Identified a Coverage Determination Made in the Award</u>

Depositors also argues that the shingle matching dispute raised by the HOA is not a coverage dispute, and is instead a dispute about the method of valuation. *FDL, Inc. v. Cincinnati Ins. Co.*, 135 F.3d 503, 505 (7th Cir. 1998). "The HOA contends that replacement cost means the cost to achieve uniformity, while Depositors advocates for a valuation of replacement cost based on the cost of 'comparable material and quality' pursuant to the Policy." (Filing No. 59 at 14–15). In response, the HOA clarifies it is not disputing how Umpire Button valued the HOA's losses, but rather how Umpire Button decided the scope of losses to be valued (Filing No. 68 at 12).

The Court finds that the matching dispute relates to coverage, not valuation. The "method of valuation" is the process or approach the appraiser uses to measure or monetarily value a loss (*e.g.*, actual cash value, fair market value, replacement cost). "Method of valuation" determinations do not include determinations about the scope of loss to be valued. Depositors' caselaw is therefore

---

[2] The *Tippett* court relied heavily on the Texas Supreme Court's decision in *State Farm Lloyds v. Johnson*, 290 S.W.3d 886 (Tex. 2009). This Court has previously found *Johnson* persuasive in interpreting Indiana law, *Shifrin v. Liberty Mut. Ins.*, 991 F. Supp. 2d 1022, 1038–39 (S.D. Ind. 2014), and again finds *Johnson* and its progeny persuasive.

inapposite, and its attempt to characterize the parties' dispute as one about the "method of valuation" is unpersuasive.

The HOA plainly identifies a "question [of] coverage: whether this mismatch is a 'loss' within the meaning of the policy." *Windridge of Naperville Condos. Assoc. v. Phila. Indem. Ins. Co.*, No. 16 C 3860, 2017 WL 372308, at *2 (N.D. Ill. Jan. 26, 2017) (granting in part and denying in part motion to compel appraisal). The district court and appellate court in *Windridge* held that the question of whether a policy requires an insurer to replace undamaged property to achieve visual consistency is a coverage question for a court to decide. *Windridge I*, 2018 WL 1784140, at *1–2 ("The parties proceeded to litigate that coverage dispute, which concerns the extent of [the insurer's] obligation to replace the building's aluminum siding. . . . Thus, the court will limit its discussion to the legal question underlying the parties' dispute: Assuming no matching siding is available, whether the policy requires [the insurer] to replace or pay to replace the siding on all four elevations or only the physically damaged . . . elevations."); *Windridge II*, 932 F. 3d 1035, 1036 ("This appeal presents an insurance coverage dispute . . . ."). The Seventh Circuit again recognized that matching disputes are coverage disputes in *Villas II*. 942 F.3d at 831 ("[T]he mere presence of coverage disputes (like matching disputes) . . . does not negate an appraisal award.").

Other courts nationwide agree that the question of whether a policy requires replacement of undamaged property to achieve matching is a coverage question. *See, e.g.*, *Windridge I*, 2018 WL 1784140, at *3 (listing cases); *Culvey v. Auto-Owners Ins. Co.*, 670 F. Supp. 3d 657, 663 (N.D. Ill. 2023) ("The question of whether the Policy 'requires replacement of undamaged property to achieve matching is not appropriate for appraisal.'" (quoting *Runaway Bay Condo. Ass'n*, 262 F. Supp. 3d 599, 603 (N.D. Ill. 2017))); *Merchant*, 2023 WL 6518866, at *13 ("[T]he Court must find that it is a coverage issue, not a value issue, whether to replace only damaged pieces in a hardwood

16

floor or replace the entire floors or whether to redo an[] entire wall or replace only damaged portions of a wall . . . ."); *Auto-Owners Ins. Co. v. Summit Park Townhome Assoc.*, 100 F. Supp. 3d 1099, 1104 (D. Colo. 2015) ("Summit Park contends the appraisal process may determine whether the policy requires Auto-Owners to pay to replace undamaged property in order to achieve visual consistency. I disagree. This is a clear example of a coverage issue beyond the scope of appraisal."); *Lam v. Allstate Indem. Co.*, 755 S.E.2d 544, 545–46 (Ga. Ct. App. 2014) (affirming dismissal of action to compel appraisal because dispute as to whether insurer was required to replace some or all roof shingles was a coverage dispute and "not a proper basis for an appraisal"); *see also Cedar Bluff Townhome Condos. Ass'n, Inc. v. Am. Family Mut. Ins. Co.*, 857 N.W.2d 290, 294–95 (Minn. 2014) (interpreting "comparable material and quality"; restating that appraisers may not construe policies but affirming award construing "comparable" to mean a "reasonable" color match because appraisal panel "applied the correct legal standard"); *Walnut Creek*, 913 N.W.2d at 91 (citing cases holding that coverage determinations are reserved for courts).

The HOA has therefore identified a coverage determination that, if made by Umpire Button, would warrant supplementing or setting aside the Appraisal Award.

### 3.  <u>Whether Umpire Button Made a Coverage Determination</u>

Depositors insists that Umpire Button did not make a coverage determination, based on his testimony that he has no opinion as to Depositors' liability under the Policy, did not review the legal authority in Mr. Latham's appraisal package, and did not intend to "wade into th[e] legal thicket of case law." ([Filing No. 52-6 at 37](#):18–22). These statements are not dispositive, though, since Umpire Button could have made a coverage determination despite not meaning to.

Depositors contends that nothing in Umpire Button's testimony suggests that the Appraisal Award was based on an interpretation of the Policy ([Filing No. 75 at 8](#)). The Court disagrees. In response to several questions, Umpire Button stated that he did not believe he needed to consider

the visual uniformity of the roofs when estimating the cost of restoring the Townhomes to their

pre-loss condition, which necessarily involved a determination as to the scope of loss recoverable

under the Policy.

> Q.      . . . . Whether or not your view of the esthetics of shingle repair matches the standard for esthetics in the insurance policy is it correct you have no opinion on that?
>
> A.      . . . . My opinion was I did a reasonable estimate to restore the building to the pre-loss condition without regard to whether or not all the shingles on all the buildings were of a uniform appearance. . . .

([Filing No. 52-6 at 35](#):18–36:13).

> Q.      All right. Do I understand you when you use the phrase "like, kind, and quality materials" that has nothing to do with the color of the materials.
>
> A.      No, it doesn't have anything to do with...
>
> Q.      With what?
>
> A.      With the color. . . .

*Id.* at 48:16–49:1.

> Q.      . . . . [I]s there any reason why replacing one slope would require you to like functionally replace the other slope?
>
> A.      I don't believe there's any -- there wouldn't be any consideration other than, you know, the two slopes wouldn't look the same.
>
> Q.      So in your estimate you don't distinguish between functional and cosmetic damage; is that correct?
>
> A.      Of the shingles?
>
> Q.      Of anything, but yes.
>
> A.      No, I didn't . . . .

*Id.* at 107:20–108:10.

> Q.      On your estimate, the one you came up with, so Award Estimate in Deposition Exhibits, the first sentence says "The following repair estimate is to return the property to its pre-loss condition using like, kind, and quality materials."

18

What is the pre-loss condition in this case?

A.      . . . . [I]n the case of the shingles, it would be shingles that don't have granular loss. And in a few cases maybe some bruising that wasn't there prior to the date of the loss event.

*Id.* at 107:20–109:9.

Umpire Button also testified that if matching had been part of his appraisal, then he would have investigated whether a reasonable match existed. The fact that he did not consider the ITEL Report or conduct any investigation supports the HOA's claim that he did not consider matching:

Q.      Did you investigate whether there was a shingle on the market that would provide a uniform appearance even if you're only replacing one slope of a building?

A.      I didn't investigate . . . .

*Id.* at 21:2–6.

Q.      Did you consider the ITEL report in your analysis?

A.      In my analysis I was doing complete slopes, so I wasn't necessarily -- if I was trying to do individual shingle replacements, it would have been a consideration. But since I was doing slopes, I didn't really consider the ITEL report.

*Id.* at 28:13–19.

Q.      . . . . How did the ITEL report submitted by Mr. Latham weigh into your analysis in this case?

A.      It didn't really -- it would have weighed in if I was trying to do individual shingle replacements, but since I wasn't doing that it didn't really affect my award.

*Id.* at 109:17–110:1.

Q.      So did you make any independent observations that replacing one slope on each roof would change the esthetic of the roof?

A.      No, I didn't make any, I didn't make any independent thought that it would affect the perception from the ground one way or the other.

*Id.* at 110:13–18.

Q.      As far as your statement that you believe from your experience there are shingles in the market similar to the old ones at the property, am I correct that you did no specific investigation to support that statement?

19

A.    I did not do any specific investigation.

*Id.* at 122:20–123:1.

Q.    On the issue of current market shingles having color considered similar, you would not defer to the opinion of [the ITEL] laboratory whose business it is to make such identifications?

A.    In this case I probably would try to do my own investigation.

Q.    Which you didn't do; correct?

A.    Which I did not do.

*Id.* at 125:15–22.

Based on this testimony, and drawing all reasonable inferences in favor of the HOA, a reasonable jury could conclude that Umpire Button made a coverage determination by failing to consider losses due to mismatched slopes. *See Yogeshwar*, 739 F. Supp. 3d at 731–33. The Court thus cannot find, as a matter of law, that Umpire Button did not make a coverage determination.

### 4.    Whether the HOA is Entitled to Additional Compensation Under the Policy

Depositors lastly argues that the "Appraisal Award notwithstanding, the evidence in this case demonstrates that Depositors paid the HOA for the cost to replace the damaged portion of its buildings with shingles of 'comparable material and quality.'" (Filing No. 59 at 15). Stated differently, the HOA is not entitled to any additional compensation under the Policy, so Umpire Button's alleged error is harmless, and the Appraisal Award should be enforced. *Travelers Prop. Cas. Co. of Am. v. Marion T, LLC*, No. 07-cv-1384, 2010 WL 1936165, at *8 (S.D. Ind. May 12, 2010) (finding appraisers' error in failing to consider certain damages was "harmless" because insurer was not entitled to those damages); *see also Cedar Bluff*, 857 N.W.2d at 293–94 (affirming appraisal award notwithstanding coverage determination because appraisal panel "applied the correct legal standard"). Depositors specifically argues: (a) the HOA's caselaw is inapplicable, and

the Policy does not require an exact shingle match; and (b) the HOA has no evidence supporting

its claim for additional compensation to ensure matching.

### a.  __HOA's Caselaw and the Policy Language__

The HOA argues that two cases, *Erie Insurance Exchange v. Sams*, 20 N.E.3d 182 (Ind. Ct.

App. 2014), and *Windridge II*, 932 F.3d 1035, show that Depositors is required to pay for full roof

replacements under the Policy (Filing No. 54 at 1, 12). In *Erie*, a storm damaged one side of a

home's siding and roof, but siding and shingles matching the originals were unavailable. The policy

provision at issue stated "[p]ayment will not exceed the smallest of . . . the replacement cost of that

part of the dwelling damaged for equivalent construction and use on the same premises." 20 N.E.3d

at 191. The parties disputed whether "that part of the dwelling" meant individual roof slopes and

elevations of siding or the entire roof and all siding. Because the court's decision in *Erie* was based

on different policy language, it is largely inapplicable. *Windridge*, however, is persuasive. As

Depositors acknowledges, "the insurance policy language in *Windridge* appears comparable to that

in the Policy." (Filing No. 59 at 18). Under the policy in *Windridge*, like the Policy here, the insurer

promised to "'pay for direct physical "loss" to Covered Property caused by or resulting from'" the

storm, with the amount of loss being "'[t]he cost to replace the lost or damaged property with other

property . . . [o]f comparable material and quality . . . and . . . [u]sed for the same purpose[.]'"

*Windridge II*, 932 F.3d at 1039 (alterations and omissions in original); (Filing No. 58-1 at 45, 72).

The material facts of *Windridge* are also similar to the facts of this case. In both cases, only a

portion of the covered property was physically damaged, and the insured alleged that no available

replacement material would match the original material.

Depositors asks the Court to distinguish *Windridge* because the insured buildings in

*Windridge* had uniform siding on all elevations before the storm and because "the mismatched

siding described in *Windridge* involves more of a visual discrepancy than can be claimed here"

since the Townhomes roofs' cannot be inspected "from ground level." (Filing No. 59 at 18–19). These distinctions are immaterial. The *Windridge II* court held that under the replacement-cost policy at issue, the insurer was required to return the insured property to its pre-loss state. 932 F.3d at 1042. The Seventh Circuit never stated that the insurer would be released from this obligation if the insured property had "less than perfect pre-loss uniformity" or if the non-uniformity was not readily noticeable (Filing No. 68 at 14). In situations involving "more limited damage"—perhaps where few shingles were damaged, the insured building had very little pre-loss uniformity, or a reasonable match is available—"common sense" dictates that the insured would instead be entitled to "the (presumably minor) decrease in value of the building." *Windridge II*, 932 F.3d at 1042. But in *Windridge* and in this case, the insurers chose to pay to repair the damaged property, which may require the replacement of undamaged property to ensure matching, even if those repairs leave the insured in a better position than before the loss. "When the insurance industry adopted a standard extension of coverage endorsement to provide replacement cost, it took into account the one great hazard in providing this kind of coverage: the possibility for the insured to reap a substantial profit, if [a loss] occurs." *Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 352 (Ind. 1982); *see Sams*, 20 N.E.3d at 190; *Rockford Mut. Ins. Co. v. Pirtle*, 911 N.E.2d 60, 65 (Ind. Ct. App. 2009) ("Any purported windfall to an insured who purchases replacement cost insurance is precisely what the insured contracted to receive in the event of a loss."). *Windridge* is therefore applicable and persuasive, despite the fact that the Townhomes may not have had perfect pre-loss uniformity and the mismatch between slopes may not be readily apparent.

Depositors also argues that *Windridge* is distinguishable because it applied Illinois law, but Illinois and Indiana apply the same principles when interpreting insurance policies. *See Phila. Indem. Ins. Co. v. Flippen Flyers Track Club*, No. 20 C 1753, 2023 WL 1766489, at *4–5 (N.D.

Ill. Feb. 3, 2023). Just as the *Windridge II* court relied on decisions applying Minnesota and District of Columbia law, 932 F.3d at 1041 & n.5, this Court may rely on a decision applying Illinois law.

Given the factual and legal similarities between *Windridge* and this case, the Court sees no reason to depart from the Seventh Circuit's reasoning. In *Windridge* and in this case, "the unit of covered property to consider under the policy (each panel of siding [or each shingle] vs. each side [or each slope] vs. the building as a whole) is ambiguous." *Id.* at 1040. Under Indiana law, ambiguities in insurance contracts must be construed in favor of coverage. *See, e.g.*, *Auto-Owners Inc. Co. v. Benko*, 964 N.E.2d 886, 890 (Ind. Ct. App. 2012). This Court therefore adopts the Seventh Circuit's well-reasoned interpretation of the same policy language:

> The better construction, and one certainly permitted by policy language that is ambiguous as applied to these facts, is that each building as a whole suffered direct physical loss as a result of the storm. The storm altered the appearance of the buildings such that they were damaged. Condominium buildings with mismatched [roof slopes] are not the post-storm outcome that the insured was required to accept under this replacement-cost policy. . . .
>
> [Depositors] seeks to leave [the HOA] with buildings that have [one slope] in one color and [one slope] in another. . . . [The HOA] has not yet been made whole. It has not been returned to its pre-storm status. [Depositors] chose to insure [the HOA's] 'buildings,' which—because of the storm—were all damaged.

*Windridge II*, 932 F.3d at 1041–42. If the Appraisal Award is not binding, and no available replacement shingle can restore the Townhomes to its pre-storm condition, then the Policy may require Depositors to pay for full roof replacements.

### b. Evidence of Additional Compensation Owed

Depositors next argues that the HOA's expert affidavits are inadmissible to show the extent of the Townhomes' pre-loss uniformity, and the ITEL Report fails to show that no "comparable" shingles are available. Depositors contends that because the HOA cannot establish the pre-loss condition of the Townhomes or the unavailability of a comparable repair shingle, the HOA cannot show it is entitled to new roofs. The Court again disagrees with Depositors.

In its opening brief, the HOA cites affidavits from Mr. Kortzendorf and Mr. Burkert to show that the Townhomes had between ninety-nine and one-hundred percent uniform appearances before the hailstorm (Filing No. 54 at 5–6). Depositors moves to strike these affidavits because the HOA did not timely disclose Mr. Kortzendorf and Mr. Burkert as experts, but Depositors does not explain what portions of their affidavits constitute expert opinions (Filing No. 59 at 15–16, 18 & n.4). The HOA responds that Mr. Kortzendorf and Mr. Burkert's assertions are based solely on their personal knowledge and constitute admissible lay testimony. Depositors replies, in a single footnote, that their statements are "made based on their respective 'employment, position, and credentials,'" and "leverages 'technical, or other specialized knowledge' to aid the understanding of the evidence." (Filing No. 75 at 15–16 n.2). Regardless of Mr. Kortzendorf and Mr. Burkert's potential specialized knowledge, their affidavits appear to contain only factual assertions based on first-hand observations. *See United States v. York*, 572 F.3d 415, 420 (7th Cir. 2009). To the extent Depositors specifically takes issue with Mr. Kortzendorf and Mr. Burkert's calculations of the Townhomes' level of pre-loss uniformity, copious photographs of the Townhomes serve to prove the same point (Filing No. 68 at 6). Depositors does not challenge the admissibility or authenticity of these photographs, and the photographs alone are sufficient to create a genuine dispute as to whether the Townhomes' roofs had sufficient pre-loss uniformity to require full roof replacements. The Court therefore **denies** Depositors' motion to strike.[3]

Depositors also argues that the ITEL Report does not show that comparable replacement shingles are unavailable because ITEL Report searched for "similar" shingles, not "comparable" shingles (Filing No. 59 at 19). However, Depositors does not assert what it believes "comparable" means or explain how it differs from "similar." *Cf., e.g.*, *Cedar Bluff*, 857 N.W.2d at 293–94 ("[O]n

---

[3] Depositors' Objections to Plaintiff's Expert Testimony (Filing No. 76) remains pending and if appropriate, can be ruled on in a separate entry before trial.

the spectrum of resemblance, 'comparable material and quality' requires something less than an identical color match, but a reasonable color match nonetheless."); *Maplebrook Ests. Homeowner's Assoc., Inc. v. Hartford Fire Ins. Co.*, No. 21-cv-01532, 2024 WL 869069, at *13 (D. Minn. Feb. 29, 2024) (finding that appraisers appropriately determined whether replacement siding was "of 'like kind and quality[,]' a functionally synonymous phrase to 'comparable material and quality'" (alteration in original)); *Republic Underwriters Ins. Co. v. Mex-Tex, Inc.*, 150 S.W.3d 423, 425 (Tex. 2004) (stating that "comparable material and quality" allows "more leeway" than "identical"). Depositors asserts that "'comparable' appears to be the standard Rocklane applied for shingle repairs to the Townhomes prior to the date of loss" (Filing No. 59 at 19), but there is no evidence that Rocklane considered the non-matching repair shingles to be "comparable." (Filing No. 58-16 at 13:11–16:1). Moreover, Rocklane's understanding of "comparable" is irrelevant to the interpretation of that term under Indiana law.

Depositors contends that "the Umpire already considered and accounted for the ITEL Report" (Filing No. 59 at 20), but this argument is contradicted by designated evidence. Umpire Button stated several times that he did *not* consider the ITEL Report in preparing the Appraisal Award (Filing No. 52-6 at 28:13–19, 109:17–110:1). Depositors further contends the ITEL Report is "unreliable" and "problematic" because the HOA cannot identify which building the sample shingle came from, ITEL cannot identify the sample shingle manufacturer, and the sample shingle did not have a "shadow mark" like other shingles on the Townhomes' roofs (Filing No. 59 at 20). These arguments speak to the weight of the ITEL Report (Filing No. 68 at 18). A reasonable jury could still accept the ITEL Report, conclude that the Townhomes cannot be returned to their pre-loss appearance using any existing shingle on the market, and, assuming the Appraisal Award is not binding, find that the HOA is entitled to additional compensation under the Policy.

Depositors has not shown, based on the undisputed material facts, that the Appraisal Award cannot be supplemented or set aside or that, notwithstanding the Appraisal Award, HOA is not entitled to additional compensation under the Policy. Depositors' Motion for Summary Judgment is therefore **denied** as to Count I.[4]

### 5.  Public Policy Concerns

Depositors cautions the Court that "[s]etting aside or supplementing the Appraisal Award in this case frustrates the purpose of the Policy's appraisal provision" and may "reverberate beyond this lawsuit, create undue uncertainty across the property insurance industry, and lead to increased consumer costs." (Filing No. 75 at 12). The Court acknowledges the importance of appraisals but disagrees that this decision will "subvert [their] very purpose." *Id.* By holding that the Appraisal Award may be set aside if Umpire Button made a coverage determination, the Court is merely applying the Appraisal Provision as written and reaffirming the numerous courts that have held that appraisers may not make coverage determinations, that matching disputes are coverage disputes, and that appraisal awards making coverage determinations are *ultra vires* and manifestly unfair. Further, there is no reason to anticipate that this decision will encourage unnecessary litigation or allow insureds to "'short-circuit the appraisal process.'" *Id.* (quoting *FDL*, 135 F.3d at 505). This decision is limited to its unique facts and Policy language. Its broader effect, if any, may be to encourage parties to distinguish between outstanding coverage disputes and valuation disputes before proceeding to appraisal and to discourage insurers from exploiting the appraisal process by attempting to enforce appraisal awards that exclude losses based on improper coverage determinations. *See Tippett*, 2020 WL 827143, at *14 ("Safeco could not invest the appraisers with

---

[4] Because Depositors' Motion is denied as to Count I because of genuine disputes about whether Umpire Button considered matching, the Court need not, and does not, reach the HOA's additional arguments that Umpire Button's failed to consider ice and water shield repairs in the Appraisal Award (Filing No. 68 at 11).

the power to make judicial determinations by invoking the appraisal process and obtaining a finding on the applicability of the cosmetic-damage exclusion.").

This case may also serve to inspire cooperation between insureds and insurers facing similar "matching" disputes. Before the appraisal inspection in this case, Mr. Latham suggested a "dual column award" that would set out the award for "actual damages" caused by hail in one column, and the award for the amount of a full roof replacement in another. Other courts have encouraged a similar approach. *See Summit Park*, 100 F. Supp. 3d at 1104 ("The appraisals should separately calculate and identify disputed costs so that the Court can either include or exclude them once it has determined whether the policy provides coverage for them. Counsel should work collaboratively to ensure that the appraisals provide sufficient detail to enable the Court to do this. Following this course will enable the parties to avoid unnecessary discovery or additional appraisals."); *see also Lee v. Cal. Cap. Ins. Co.*, 188 Cal. Rptr. 3d 753, 767 (Cal. Ct. App. 2015) ("[I]nstead of simply placing a 'zero' next to certain items of loss, thus leaving open to debate whether the panel based its decision upon an improper coverage determination, the panel could . . . clarify in its notes accompanying the award that items assigned a loss value of zero were not damaged or did not exist at the property."); *Maplebrook*, 2024 WL 869069, at *12 ("'[T]he panel made no determination on whether the policy covered matching and separated out the number[s] so the parties could interface the policy coverage with the award.'" (second alteration in original)); Mr. Norman unfortunately declined the offer to use a dual column format based on a prior bad experience (Filing No. 52-4 at 49). Had he agreed, the parties and the Court may have been spared some of the substantial time and resources already expended in this litigation.

In sum, the Court's decision will not subvert the purpose of appraisals or erode parties' confidence in them, and neither will a potential jury verdict setting aside the Appraisal Award.

**B. Count II: Breach of Contract**

Both parties move for summary judgment on the HOA's breach of contract claim. The Court will discuss each motion in turn.

**1. Depositors' Motion for Summary Judgment**

Depositors argues the Policy does not require it to "match replacement shingles with existing shingles," so it did not breach the Policy by failing to pay for full roof replacements (Filing No. 59 at 21). Depositors relies on *Villas I*, in which the Court held that the policy at issue did not require the insurer to exactly match replacement shingles to existing shingles and only required replacement shingles of a "comparable material and quality." *Id.* However, *Villas* is distinguishable in three important ways.

First, the insured in *Villas* specifically argued that the policy required replacement shingles to exactly match the old shingles. *Villas I*, 2019 WL 1434220, at *15 (finding that policy unambiguously did not require exact matching). In this case, the HOA does not seek an exact match; it seeks any shingle that can return the Townhomes to its pre-loss condition and argues that no such shingle exists on the market. Second, in *Villas*, the insured argued that under the policy, "replacing one shingle requires replacing all shingles," *Villas II*, 942 F.3d at 833, and the Court held the insured was not entitled to a new roof "simply because a few replacement shingles could not be matched." *Villas I*, 2019 WL 1434220, at *15. Here, the HOA does not argue that a new roof is needed just because a few replacement shingles cannot be matched. Instead, it argues that due to the extent of damage and unavailability of a similar shingle, only a full roof replacement can restore the Townhomes to its pre-storm condition. (Filing No. 54 at 12); *see Windridge II*, 932 F.3d at 1041. Third, and most importantly, the appraisal award in *Villas* was binding as to all replacement costs owed under the policy. As a result, the *Villas* insured could not argue that the insurer was required to pay for a new roof as part of its obligation to pay replacement costs, like

28

the HOA does in this case. The *Villas* insured instead argued, without "cit[ing] any language from the Policy," that the insurer was required to provide matching shingles, independent of its obligation to cover replacement costs. 2019 WL 1434220, at *15.

*Villas* therefore shows only that the Policy does not require Depositors to match shingles exactly; provide a new roof whenever a few replacement shingles cannot be matched; or ensure visual uniformity, independent of its obligation to pay all replacement costs. However, as explained above, a reasonable jury could find that the Appraisal Award is not binding and that additional replacement costs are owed under the Policy. Because Depositors refuses to pay those additional costs, a reasonable jury could also find that Depositors breached the Policy. Depositors' Motion for Summary Judgment is therefore **denied** as to Count II.

### 2.   The HOA's Motion for Partial Summary Judgment

The HOA cross-moves for summary judgment on Count II. Although the Court has held that genuine disputes of material fact preclude judgment in favor of Depositors on this claim, genuine disputes of material fact likewise preclude judgment in favor of the HOA. Portions of Umpire Button's testimony indicate that he *did* consider the matching issue and valued that loss at zero dollars. In that event, there would be no basis to disturb the Appraisal Award. *See Lee*, 188 Cal. Rptr. 3d at 767 ("[A]n appraisal panel does not necessarily exceed its authority by assigning a value of zero to items of loss submitted to it for consideration."); *Johnson*, 290 S.W.3d at 894 ("[W]hen the parties disagree whether there has been any loss at all, nothing prevents the appraisers from finding '$0' if that is how much damage they find.").

Specifically, Umpire Button testified that he believed that the Townhomes' repaired roofs would appear uniform because both slopes cannot be seen from the ground and a reasonable shingle match would be available on the market:

Q.    . . . . [W]as it a concern to you that each of these building would have the extent of uniform appearance that they had before the loss?

A.    . . . . So I was generally doing an entire slope and. If [*sic*] you do an entire slope, I think it generally doesn't affect the appearance because you can't see, you can't see multiple slopes from any particular view.

Q.    So from your architectural perspective, it doesn't concern you that one slope of the building would have one color shingles and another slope of the building would have different color shingles?

A.    I mean if it was -- in my opinion it still creates a uniform appearance if you're doing an entire slope. If I was doing spot repairs, it would be, in my opinion, a different situation.

Q.    Did you investigate whether there was a shingle on the market that would provide a uniform appearance even if you're only replacing one slope of a building?

A.    I didn't investigate, but I know just from general experience that there's all different colored shingles that are similar in type. And if you were going to do an entire slope, my opinion was it would relatively -- you could find something that would relatively match.

(Filing No. 52-6 at 20:1–21:11).

Q.    I think you said . . . that you just felt as a matter of experience, not of any particular investigation, that there were repair shingles on the market which would provide or restore the uniform appearance of both slopes of each building?

. . . .

A.    I thought there would be a reasonable, not an ITEL match, but some form of shingle of the same type that would reasonably match what was there.

*Id.* at 20:1–21:14.

Q.    . . . . [A]m I correct that you did no specific investigation to support that statement?

A.    I did not do any specific investigation.

Q.    Would it be fair to characterize that statement as an unverified hunch?

A.    My experience is there's just such a wide variety of colors of shingles that you'd be able to find something that was relatively close. I didn't any additional research or bring any shingles up with me. Yeah, it's not a verified statement I guess.

*Id.* at 122:20–123:12.

Q.    . . . . You didn't consider how [the roof] would look from the ground?

A.    I didn't -- I just -- from my perspective, there was enough hail damage on the sides of the roof that got impacted by the date of loss event that if I was replacing the whole slope it wouldn't be noticeable because I'm doing the whole slope.

Q.    And is it your knowledge based on your experience in this industry that there should be shingles available that are close enough to where if you run to the back of the condo and look up and then you run to the front of the condo and look up, they look pretty much, they look similar?

A.    I would think from the ground you could find something that looked similar.

*Id.* at 110:20–111:13.

Umpire Button also testified that the Townhomes roofs were not of a uniform appearance before the storm:

Q.    . . . . Whether or not your view of the esthetics of shingle repair matches the standard for esthetics in the insurance policy is it correct that you have no opinion on that?

A.    . . . . My opinion was I did a reasonable estimate to restore the building to the pre-loss condition without regard to whether or not all the shingles on all the buildings were of a uniform appearance. Partially I thought my stance was reasonable because there were previous repairs on buildings that already didn't match and I was doing complete slopes. So I thought it was reasonable.

*Id.* at 36:1–13 .

Based on the above testimony, when drawing all reasonable inferences in Depositors' favor, a reasonable jury could find that Umpire Button did consider mismatching and assigned a zero-dollar value to that type of loss. Absent any improper coverage determinations, the Appraisal Award would be binding, and Depositors' failure to pay any additional amounts would not form the basis for a breach of contract claim. *See Villas I*, 2019 WL 1434220, at *10 (holding that the insurer had no independent duty to ensure matching). The HOA's Motion for Partial Summary Judgment is therefore **denied**.

**C.** **Count III: Bad Faith**

Depositors lastly moves for summary judgment on the HOA's bad faith claim. The HOA alleges that Depositors acted in bad faith by "making an unfounded refusal to pay Policy proceeds after the Award with no rational, principled basis for doing so and causing an unfounded delay in making payment by delaying appraisal and refusing further claim payment after the award." (Filing No. 6-1 ¶ 38). Depositors responds that it fulfilled its obligations to act in good faith by engaging independent professionals to inspect the Townhomes, participating in appraisal, and promptly issuing payments based on the inspections and Appraisal Award (Filing No. 59 at 25).

In Indiana, an insurer has a duty to deal with its insured in good faith. *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 518–19 (Ind. 1993). This duty includes "the obligation to refrain from making an unfounded refusal to pay policy proceeds, causing an unfounded delay in making payment, deceiving the insured, or exercising any unfair advantage to pressure the insured into settlement of his claim." *Johnston v. State Farm Mut. Auto Ins. Co.*, 667 N.E.2d 802, 804 (Ind. Ct. App. 1996). However, "a good faith dispute about the amount of a claim will not supply the basis for recovery." *Id.* Likewise, "[p]oor judgment or negligence do not amount to bad faith; the additional element of wrongdoing must also be present." *Colley v. Ind. Farmers Mut. Ins. Grp.*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998). "'[A] finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will.'" *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005) (quoting *Colley*, 691 N.E.2d at 1261). "To prove bad faith, the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability." *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002).

In response, the HOA cites several facts purportedly showing that Depositors' "claim handling in this case was purposely slanted to be self-serving and not fair dealing with its insured."

(Filing No. 68 at 30). As an initial matter, "neither the Indiana Supreme Court nor the Indiana Court of Appeals has recognized a claim for bad faith claims handling." *Telamon Corp. v. Charter Oak Fire Ins. Co.*, 179 F. Supp. 3d 851, 856 (S.D. Ind. 2016); *see Brandell v. Secura Ins.*, 173 N.E.3d 279, 288 (Ind. Ct. App. 2021) (stating Indiana courts have not recognized a claim for bad faith claim handling and analyzing bad faith under *Hickman* obligations). The HOA provides no authority or argument as to the viability of a claim for bad faith claims handling, so the Court will analyze the HOA's claim under the four obligations articulated by the Indiana Supreme Court: the obligations to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising an unfair advantage to pressure an insured into settlement of its claim. *Hickman*, 622 N.E.2d at 519.

To start, the HOA notes that Depositors' October 2020 Estimate was substantially lower than the Appraisal Award, and that the EES Report, like the Appraisal Award, found evidence of hail damage to several Townhomes buildings but only allowed for a roof replacement of one building (Filing No. 68 at 27–28). The fact that EES and Depositors made different findings, allowed for different repairs, or estimated the HOA's loss lower than the Appraisal Award does not show bad faith. The HOA does not argue that the EES Report or Depositors' reliance on it are unfounded or unreasonable, and it is well established that insurers have the right to dispute claims. *See Hickman*, 622 N.E.2d at 520.

The HOA relatedly notes that the EES Report "found hail damage on only the north and west slope[s] of Building 12," but "Depositors replaced all slopes on Building 12 (72.33 squares of shingles) contrary to its coverage position denying full replacement when half roofs are hail damaged." (Filing No. 68 at 27). However, the EES Report and October 2020 Estimate provided

for a full roof replacement, "(72.33 squares of shingles)," for Building 7, not Building 12.[5] *Id.* This distinction is important because the EES Report did not just find hail damage to the north and west slopes of Building 7; it also found missing shingles on the west and east slopes, which are connected to Building 7's south slope.[6] So according to the EES Report, Building 7 was the only building with damage to, or connected to, all four slopes.[7] Depositors' decision to allow a full roof replacement for Building 7 is therefore not contrary to its current position that no full replacements are required "when half roofs are hail damaged." ([Filing No. 68 at 27](#)).

The HOA next points out that Depositors did not obtain the report prepared by Alliance, even though Alliance accompanied EES on its inspection; and that Depositors did not "accept" the ITEL Report, even though ITEL is one of Depositors' approved vendors. *Id.* at 28. These allegations relate to Depositors' handling of the HOA's claim, and not any of the four obligations announced in *Hickman*, so they cannot form an action for bad faith. *See Telamon*, 179 F. Supp. 3d at 856; *see RAP Indy, LLC v. Zurich Am. Ins. Co.*, No. 19-cv-04657, 2021 WL 2416740, at *9 (S.D. Ind. June 14, 2021) (stating that the insured's "alleged suspicion . . . that the claims were an 'inside job'" does not "amount to conscious wrongdoing" by the insurer because Indiana does not recognize a claim for bad faith claims handling); *Fetter v. State Farm Fire & Cas. Co.*, No. 22-cv-00486, 2024 WL 4880891, at *13 (S.D. Ind. Sept. 19, 2024) (dismissing claim alleging that insurer

---

[5] The HOA appears to have confused Building 12 (8246–8266 Caroline Ln., mistakenly identified as 8246–8266 Katrina Way in the October 2020 Estimate) and Building 7 (8249–8269 Katrina Way). Depositors allowed for a full roof replacement (72.33 SQ; replacement cost value of $27,796.16) for "8249 to 8269 Katrina Way," which is Building 7 ([Filing No. 58-6 at 5](#), 10; [Filing No. 58-7 at 6](#)–7).

[6] As shown in an arial photograph of the Townhomes ([Filing No. 58-6 at 4](#)), the buildings at issue have two primary roof slopes—one facing north and one facing south—and each building has gables/dormers on either its north or south façade, with the east/west dormer roof slopes connected to the respective façade. Building 7 has dormers on its south façade, so the east/west dormer roofs are connected to the south roof slope.

[7] The EES Report also notes missing shingles on the east dormer roof slopes of Buildings 8 and 12, but Building 8 and 12's dormers are on the *north* façades, so the east/west dormer slopes are connected to the north roof slopes.

conducted fire damage investigation in bad faith by "searching for evidence of motive and opportunity before it had evidence the fire was incendiary"). Although an insurer's intentional failure to conduct any investigation might show bad faith, Depositors' failure to consider two reports does not rise to that level. *Compare Gooch v. State Farm Mut. Auto. Ins. Co.*, 712 N.E.2d 38, 41 (Ind. Ct. App. 1999), *with Atlanta Gas Light Co. v. Navigators Ins. Co.*, No. 20-cv-02441, 2023 WL 9058615, at *7 (S.D. Ind. Sept. 22, 2023) (describing insurer's conduct in *Gooch* as "malicious[] fail[ure] to investigate"); *Lummis v. State Harm Fire & Cas. Co.*, No. 04CV0080, 2005 WL 1417053, at *10–11 (S.D. Ind. June 16, 2005) ("[P]laintiffs' speculative hypotheses . . . are not comparable to the 'compelling' factual evidence confronting the insurer in *Gooch*. At most, plaintiffs' speculation might support a claim of negligence, not bad faith."); *and McClain v. Madison Nat'l Life Ins. Co.*, No. 11-CV-377, 2014 WL 4377458, at *25 (N.D. Ind. Sept. 4, 2014) ("The failure to get raw data . . . at most, shows negligence.").

The HOA further alleges that "Depositors obdurately and without cause resisted appraisal." (Filing No. 68 at 28). However, the designated evidence shows that Depositors had a rational basis for initially resisting appraisal. When the HOA first demanded appraisal, Depositors believed that the parties' dispute related to the extent of the damage rather than its value, so the claim was not appropriate for appraisal (Filing No. 52-7 at 24:6–28:6, 45:20–46:4). Depositors reasserted this position after the HOA filed suit to compel appraisal. Answer and Affirmative Defenses ¶ 7(c), *Townhomes I*, No. 1:20-cv-02788 (S.D. Ind. Nov. 4, 2020). The HOA next contends that Depositors has litigated this action in bad faith by asserting a Policy limitations defense in its Motion to Dismiss and by "relying on its interpretation of Policy language already found ambiguous and strictly construed against the insurer in Windridge which is controlling." (Filing No. 68 at 29). The

fact that Depositors' Policy limitations defense and interpretation of the Policy language were unsuccessful does not make them unreasonable.

The HOA lastly argues that "Depositors has failed to pay the depreciation . . . in its October 2020 claim estimate upon the HOA's completion of entire roof replacement on all 11 subject buildings in 2023." *Id.* However, the undisputed evidence shows that Depositors promptly paid the amount of depreciation in the Appraisal Award upon completion of the HOA's roof repairs (Filing No. 58-12; Filing No. 58-13). The HOA cites no Policy language or caselaw stating that Depositors was required to pay the depreciation any sooner (Filing No. 68 at 29 (citing, without elaboration, *Windridge II*, 932 F.3d at 1042 n.6, stating only that the insured could still recover replacement costs despite waiting to repair roofs until coverage disputes were resolved)).

The HOA has not shown that Depositors made an unfounded refusal to pay policy proceeds, caused an unfounded delay in payment, deceived the HOA, or unfairly pressured the HOA into settling its claim. Nor has the HOA shown that Depositors acted with a "state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Magwerks*, 829 N.E.2d at 977; *see Wilson v. Am. Fam. Mut. Ins. Co.*, 683 F. Supp. 2d 886, 889 (S.D. Ind. 2010) ("[S]ummary judgment for the insurer has been affirmed when the insurer had a good faith legal argument for disputing the claim, when the insurer misread a report and misconstrued case law without conscious wrongdoing, and when the insured presented no evidence that the insurer had a culpable mental state." (internal citations omitted)). Even when viewing the facts in the light most favorable to the HOA, no reasonable jury could find, based on clear and convincing evidence, that Depositors acted in bad faith. Depositors' Motion for Summary Judgment is therefore **granted** as to Count III.

## IV.    <u>CONCLUSION</u>

For the reasons explained above, the Court **DENIES** the HOA's Motion for Partial Summary Judgment (Filing No. 53), **GRANTS in part and DENIES in part** Depositors' Motion

for Summary Judgment (Filing No. 57), and **DENIES** Depositors' motion to strike. Depositors'

Motion for Summary Judgment is **granted** as to Count III (the bad faith claim), which is

**dismissed**. Summary Judgment is **denied** as to Count I (the claim to supplement or set aside the

appraisal award) and Count II (breach of contract), and these claims will proceed **to trial or**

**settlement**.

The parties are **DIRECTED** to contact the Magistrate Judge to discuss whether another

settlement conference might be helpful. This matter remains set for a final pretrial conference on

May 28, 2025, and a jury trial to begin on June 23, 2025.

**SO ORDERED**.

Date:   3/7/2025

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Donald D. Levenhagen
Donald D. Levenhagen, Attorney
dlevenhagen@comcast.net

Natalie M. Limber
Dentons US LLP
natalie.limber@dentons.com

Sulema Medrano Novak
Dentons US LLP
sulema.medrano@dentons.com

Emily Steeb
Dentons US LLP
emily.steeb@dentons.com